Laura Denvir Stith, Judge
James Braddy appeals the Iron County circuit court's judgment committing him to the department of mental health as a sexually violent predator (SVP). Mr. Braddy argues he received ineffective assistance of counsel at his commitment trial because his counsel discussed the pretrial SVP screening process during opening statements and elicited testimony on the subject from expert witnesses. He also argues the circuit court erred in failing to exclude evidence of a prior murder arrest. He further claims the circuit court erred in failing to strike for cause a juror who was one of several venirepersons who raised their hands when the venire panel was asked generally whether any of them agreed with another juror who later was disqualified for cause.
This Court affirms the judgment. While Mr. Braddy was entitled to effective assistance of counsel, see In the Matter of the Care and Treatment of Nicholas Grado, No. 96830, 559 S.W.3d 888, 2018 WL 4572722 (Mo. banc 2018), he has failed to show counsel was ineffective under either the "meaningful hearing based on the record" standard for ineffective assistance of counsel now applied in Missouri termination of parental rights cases, see In Interest of J.P.B., 509 S.W.3d 84, 97 (Mo. banc 2017) , or under the Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), standard applied in SVP cases in other states. Reviewing Mr. Graddo's evidentiary and juror qualification claims only for plain error due to his failure to timely file a motion for new trial, this Court determines no manifest injustice occurred.
I. FACTUAL AND PROCEDURAL BACKGROUND
James Braddy was found guilty of one count of first-degree statutory rape under *908 section 566.032, RSMo Supp. 2006.[1] The circuit court found him to be a persistent sexual offender under section 558.018, RSMo Supp. 2006,[2] and sentenced him to seven years in prison. He successfully completed the Missouri Sex Offender Program, and the department of probation and parole recommended him for early release.[3]
When, as in Mr. Braddy's case, an incarcerated person has been convicted of a sexually violent offense, section 632.483, RSMo Supp. 2014, requires, "Within three hundred sixty days prior to the anticipated release from a correctional center," the incarcerated person must undergo a screening process to determine whether he or she meets the definition of an SVP under Missouri law.
The screening process for Mr. Braddy began when Dr. Nena Kircher performed an end-of-confinement evaluation prior to Mr. Braddy's release and determined he met the definition of an SVP. The department of corrections then referred Mr. Braddy to a multidisciplinary team and a prosecutor's review committee, which also separately concluded he met the SVP criteria.[4] The State subsequently filed a petition in the Iron County circuit court pursuant to section 632.486, RSMo Supp. 2001, requesting Mr. Braddy remain in custody "for evaluation as to whether he is a sexually violent predator; and for a trial on the issues." The circuit court held a hearing pursuant to section 632.489.2, RSMo Supp. 2009; found there was probable cause Mr. Braddy was an SVP; and ordered the department of mental health to perform an additional mental examination. Dr. Rick Scott performed the evaluation and diagnosed Mr. Braddy with antisocial personality disorder and pedophilia.
A jury trial was then held to determine whether Mr. Braddy was an SVP. At trial, the State attempted to introduce a state-prepared timeline summary of Mr. Braddy's conviction history. Mr. Braddy objected and renewed his pretrial motion in limine concerning prior bad acts, which the circuit court had taken under advisement. He argued the timeline contained unduly prejudicial information about a prior conviction because the timeline notes he originally had been charged with "murder/hindering" but ultimately was convicted only of hindering prosecution of the actual murderer. The court overruled the objection.
Dr. Kircher, the end-of-confinement screener, testified at trial she diagnosed Mr. Braddy with antisocial personality disorder, a mental abnormality predisposing him to commit acts of sexual violence. Dr. Kircher further testified she believed Mr. Braddy met the SVP criteria - a threshold only 3 to 5 percent of the individuals she evaluates meet. The State also called its own expert, Dr. Kimberly Weitl, a psychologist who interviewed Mr. Braddy and reviewed his records prior to trial. Dr. Weitl testified she diagnosed Mr. Braddy with *909 pedophilic disorder, antisocial personality disorder, and narcissistic personality disorder, and indicated she believed he met the SVP criteria.
By contrast, Dr. Scott, who conducted the court-ordered mental examination, was called by Mr. Braddy's counsel. He testified he diagnosed Mr. Braddy with antisocial personality disorder and pedophilia but also testified favorably to Mr. Braddy that he could not say he met the SVP criteria.
The jury unanimously found Mr. Braddy to be an SVP and, on June 9, 2016, the circuit court committed Mr. Braddy to the department of mental health. Mr. Braddy filed a motion for new trial 36 days after the judgment. The circuit court overruled the motion, and this Court granted transfer. Mo. Const. art. V, § 10 ; Rule 83.02.
II. STANDARD OF REVIEW
Whether Mr. Braddy was entitled to effective assistance of counsel in the SVP commitment proceeding is a question of law. "This Court reviews questions of law de novo ...." Fendler v. Hudson Servs., 370 S.W.3d 585, 588-89 (Mo. banc 2012) . Mr. Braddy's additional points are not preserved for review under Rule 78.07(a) because he failed to file a timely motion for new trial. Unpreserved issues "can only be reviewed for plain error, which requires a finding that manifest injustice or a miscarriage of justice has resulted from the trial court error." State v. Letica, 356 S.W.3d 157, 167 (Mo. banc 2011) .
III. MR. BRADDY FAILED TO SHOW HE RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL DURING HIS COMMITMENT PROCEEDING
Mr. Braddy alleges his trial counsel was ineffective when she discussed various steps of the pretrial SVP screening process during opening statements and through examination and cross-examination of various expert witnesses at trial. He says this brought otherwise inadmissible and unfairly prejudicial information before the jury. The State argues Mr. Braddy had no right to effective assistance of counsel and, therefore, this claim is without merit. It also argues the evidence was not unduly prejudicial and was part of reasonable trial strategy.
In In the Matter of the Care and Treatment of Nicholas Grado , decided today, this Court recognized a due process right to effective assistance of counsel in SVP commitment proceedings. Mr. Braddy, therefore, was entitled to effective assistance of counsel during his SVP commitment proceeding. Mr. Braddy relies on two cases from other jurisdictions to support his ineffective assistance of counsel claim. Neither of these cases involved a claim of ineffective assistance of respondent's counsel. Rather, both involved misuse of evidence of this pretrial process to try to bolster the State's case that respondent was an SVP.
In In re Care & Treatment of Foster, 280 Kan. 845, 127 P.3d 277 (2006) , during opening statements, the prosecutor told the jury the respondent's case had already been "reviewed by a ... 'multidisciplinary team' ... [and] a 'prosecutor's committee' ... who made a determination based on the records and psychologists' opinions as to whether [the respondent] was at risk to reoffend." Id. at 280 . The prosecutor further told the jury there had been a pretrial "probable cause hearing ... where a judge found enough evidence to go forward." Id. Not surprisingly, the Kansas Supreme Court held "allowing the State ... to tell the jurors - before it even hears any evidence - that a multidisciplinary team of professionals, a team of prosecutors (including *910 the attorney prosecuting the case), and the judge have all previously determined that sexually violent predator commitment proceedings should proceed against [the respondent] is extremely prejudicial." Id. at 288. This kind of evidence, it held, "stack[s] the deck" against the respondent because "a jury has a natural tendency to look for guidance from those clothed in authority." Id. at 286 .
In re Detention of Stenzel, 827 N.W.2d 690 (Iowa 2013) , involved similar conduct by a prosecutor inappropriately detailing all of the pretrial findings that respondent was an SVP as well as informing the jury the judge had found probable cause to believe respondent was an SVP. Id. at 694-95. The Iowa Supreme Court found such statements were "lacking in probative value and unfairly prejudicial to the respondent," id. at 706, and presented a " 'real danger the jury will be unfairly influenced' by a purportedly unbiased 'imprimatur,' " id. at 707 .
Here, in contrast to Foster and Stenzel, it was not the prosecutor but Mr. Braddy's counsel who introduced the evidence. The evidence was not admitted as part of an attempt to prejudice the jury into believing Mr. Braddy must be an SVP but as part of the defense effort. As in Grado , so too here, under either the Strickland standard applied to SVP proceedings in other states, or under the "meaningful hearing based on the record" standard applied in Missouri termination of parental rights cases such as In Interest of J.P.B. , Mr. Braddy's counsel was not ineffective. Indeed, Mr. Braddy does not claim he did not receive a meaningful hearing. Further, under Strickland, "actions that constitute sound trial strategy are not grounds for ineffective assistance claims," State v. Simmons, 955 S.W.2d 729, 746 (Mo. banc 1997) , and "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment," Strickland, 466 U.S. at 690, 104 S.Ct. 2052 .
Mr. Braddy's counsel appears to have brought up the screening process in her opening statement to discredit and point out shortcomings in the process the State undertook prior to trial, as follows:
You're going to hear from [the doctor who] reviewed [Mr. Braddy's] case when he was getting ready to be released. What you're going to hear from her is that the amount of review that she did was no more than about three hundred pages at the most. In a case where the pages easily reach a thousand, maybe two thousand. ... You're also going to hear that the point of her evaluation is not to come into the court and tell you whether or not he qualifies to be committed. You're going to hear from her own report that the limitation of her evaluation is to determine if [Mr. Braddy] should be screened out. That's what you're going to hear, [the doctor] coming in and saying, "Well, my job was to screen him and pass him along, not come to court, not testify in the trial, not even conduct a full evaluation of all the documents."
Counsel did not discuss additional details of the screening evaluation results during opening statements. Counsel also attempted to show the limited relevance of the prescreening process to the court proceeding during her cross-examination of Dr. Weitl after Dr. Weitl testified on direct that she used to work at the department of corrections as a pretrial screener for potential SVPs.[5]
*911 As part of an effort to discredit Dr. Kircher's end-of-confinement report Mr. Braddy's counsel also mentioned the screening process in cross-examination in an attempt to show the jury Dr. Kircher did not utilize all presently available information in making the report and did not conduct the evaluation for the purpose of testifying at trial.[6]
While the usefulness of undertaking cross-examination regarding these pretrial issues, in retrospect, seems minimal, counsel had limited options available. She knew Dr. Scott would testify Mr. Braddy did not qualify as an SVP, and counsel needed to somehow discredit the prosecution's experts, who found he did. In these circumstances, the Court cannot say the strategy, at the time, to demonstrate the limitations and superficiality of the pretrial process was so flawed as to be unreasonable.
Similarly, this Court cannot say counsel was ineffective in asking Dr. Scott about the process as part of counsel's effort to show the State's experts based *912 their opinions on incomplete information, whereas Dr. Scott had complete information when he reached his "opinion, to a reasonable degree of certainty, [Mr. Braddy is] not more likely than not to commit another sexually violent act if not confined." (Emphasis added.).[7] Mr. Braddy has failed to show his counsel's conduct was ineffective.[8]
IV. THE CIRCUIT COURT DID NOT ERR IN ALLOWING TESTIMONY CONCERNING MR. BRADDY'S PRIOR MURDER ARREST
"Evidence must be logically and legally relevant to be admissible." State v. Prince, 534 S.W.3d 813, 817 (Mo. banc 2017). Logically relevant evidence "tends to make the existence of a material fact more or less probable." Id. Logically relevant evidence is legally relevant so long as "the probative value of the evidence ... [outweighs] its costs." Id. at 818 . Mr. Braddy alleges the circuit court erred in admitting, over his objection, exhibit 4 and testimony about it showing he had been charged with murder because that charge resulted in a conviction only for hindering prosecution. He argues the mention of murder misled and unduly prejudiced the jury.
Exhibit 4 apparently was a timeline summary the prosecution created of Mr. Braddy's arrest record and showed to the jury. The briefs and record do not show the exhibit was admitted into evidence, and it has not been filed with this Court. Without the exhibit before it, this Court cannot evaluate Mr. Braddy's claim the timeline as prepared unduly emphasized *913 the initial charge rather than Mr. Braddy's actual conviction of hindering prosecution. "If original exhibits are necessary to the determination of any point relied on, they shall be deposited in the appellate court by the appellant." Rule 81.16(a). "When an exhibit is not filed with the appellate court, the intendment and content of the exhibit will be taken as favorable to the trial court's ruling and as unfavorable to appellant." Fessler v. McGovern, 524 S.W.3d 208, 216 (Mo. App. 2017) .
Dr. Weitl testified as to the contents of exhibit 4, and several witnesses were asked about Mr. Braddy's prior convictions. Their testimony is in the appellate record and, therefore, available for review by this Court. Because the motion for new trial was not timely filed, however, this Court reviews for plain error. Letica, 356 S.W.3d at 167 .[9]
Dr. Scott's testimony showed he reviewed records indicating Mr. Braddy was arrested for and charged with murder. Later, however, the State amended the charge to hindering prosecution based on evidence showing, while Mr. Braddy did not commit the murder, he went with "his buddy" to look for the victim and the buddy then murdered the victim. Because Mr. Braddy failed to report the murder, he ultimately pleaded guilty to hindering prosecution for the murder. Dr. Scott relied on this prior conviction merely as a prior sentencing he considered in determining Mr. Braddy's likelihood to reoffend. The fact the prior sentencing was for hindering prosecution of a murder in particular did not appear to be of import.
Dr. Weitl, however, testified she relied on the timeline as a summary of Mr. Braddy's criminal history in evaluating him for a mental abnormality, stating she was "really looking at everything from the time he was born until the present time" and "especially want[ed] to know about the relationships, how he interacted with other people, his sexual development, obviously, criminal history." She acknowledged even one's nonsexual criminal history is generally important because it allows her to "see that someone is not following social norms" and, in Mr. Braddy's case, showed he "wasn't following the ... conditions of probation, which is important." The nature of the hindering prosecution conviction, therefore, would have been relevant to her consideration of his prior criminal history and was part of the basis on which she ultimately diagnosed Mr. Braddy with several mental abnormalities.
Mr. Braddy nonetheless claims the evidence was unfairly prejudicial because it had the effect of "painting him as a bad or evil man." But the evidence clearly was admissible under section 490.065, which provides, "An expert may base an opinion on facts or data in the case that the expert has been made aware ... If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted." Dr. Weitl stated she relies on an individual's criminal history in determining *914 whether they meet the SVP criteria. Further, Mr. Braddy's counsel was able to bring out in her examination of Dr. Scott that Mr. Braddy was not convicted of actually having committed the murder himself. "Generally, a trial court has considerable discretion in admitting or excluding evidence." St. Louis Cty. v. River Bend Estates Homeowners' Ass'n, 408 S.W.3d 116, 123 (Mo. banc 2013) . It cannot be said the circuit court's decision to allow testimony concerning the fact Mr. Braddy had hindered prosecution for a murder rose to the level of manifest injustice required for a finding of plain error.
V. THE CIRCUIT COURT DID NOT ERR IN REFUSING TO STRIKE JUROR 4
Mr. Braddy finally alleges the circuit court abused its discretion in failing to strike Juror 4 on the ground the juror had expressed opinions concerning whether Mr. Braddy could be released and general beliefs precluding him from following the court's instructions. "Litigants have a constitutional right to trial by a fair and impartial jury of twelve qualified jurors." Thomas by & through Thomas v. Mercy Hosps. E. Communities, 525 S.W.3d 114, 118 (Mo. banc 2017) ; Mo. Const. art. I, § 22(a). Section 494.470, RSMo 2000, describes two types of bias resulting in juror disqualification:
1. ... [N]o person who has formed or expressed an opinion concerning the matter or any material fact in controversy in any case that may influence the judgment of such person ... shall be sworn as a juror in the same cause.
2. Persons whose opinions or beliefs preclude them from following the law as declared by the court in its instructions are ineligible to serve as jurors on that case.
Mr. Braddy moved to strike Juror 4 for cause after Juror 4 raised his hand during voir dire in response to the question, "who here agrees with Number 19?" To determine whether raising his hand in this manner was sufficient to require disqualification of Juror 4 for cause, this Court first must examine the responses given by Juror 19.
During voir dire, Mr. Braddy's counsel asked the venire panel, "Is there anyone here who believes that a prison sentence, any prison sentence, isn't enough as a resolution to the sort of crimes that you heard about today?" Several individuals, including Juror 19, answered in the affirmative. Mr. Braddy's counsel followed up with Juror 19 as follows:
[Mr. Braddy's Counsel] : You just answered the question. You don't - for crimes that Mr. Braddy has already been convicted of, he should never get out of prison?
[Juror 19] : If he did something to my daughter, he wouldn't be sitting there, so -
[Mr. Braddy's Counsel] : Fair enough.
[Juror 19] : That's my personal feeling.
[Mr. Braddy's Counsel] : Fair enough.
[Juror 19] : It's not that he did it once. You say there are multiple things, so am I saying that he's sick and he needs to be in mental health? I think he needs to be in the general population.
[Mr. Braddy's Counsel] : Okay. Not an option here.
[Juror 19] : Okay.
[Mr. Braddy's Counsel] : Can you consider the two options that you're given if you're a member of this jury?
[Juror 19] : I mean, I don't know.
[Mr. Braddy's Counsel] : Your body language is telling me no.
[Juror 19] : I mean, I don't know that there is - I mean, I don't know that *915 there's something you could say to me that says turn him loose, let him walk around.
[Mr. Braddy's Counsel] : Just so I can make my record and I understand, there's nothing I'm going to be able to tell you, nothing Mr. Braddy will tell you, nothing the psychologists who are testifying on behalf of Mr. Braddy can tell you that's going to let you follow the Court's instruction to let him go?
[Juror 19] : I mean, someone would have to be mentally ill to do things to children like that, so -
[Mr. Braddy's Counsel] : That's fair. That's a fair belief. I have heard that belief many, many times. Okay.
[Juror 19] : I mean, not someone in a sane mind would do that to a child.
[Mr. Braddy's Counsel]: So it sounds like you might have already made some decisions about his mental status?
[Juror 19] : I mean, it's there. I mean -
[Mr. Braddy's Counsel] : Well, and that's kind of what we've been getting at this morning is the idea that as the jury in this case, you're going to hear evidence about whether or not he has diagnoses, whether or not he should be committed. That will be for the jury to decide after they hear everything. It sounds like we're already - we're pushing things up a little bit with you, and you might have already decided that there's a mental -
[Juror 19] : I mean, I don't care whether he's committed or he's in jail. He needs to be in one or the other. He don't need to be out with my child or these other people's children. I mean, I can't just - I mean, that would be like - it's just crazy. I mean, why would you put a killer, an attack dog, in a pen with your child?
(Emphasis added).
Mr. Braddy's counsel then turned to the members of the venire as a whole and asked, "Who here, and just give me a hand, who here agrees with Number 19?" A number of venirepersons raised their hands, and Mr. Braddy's counsel called off their juror numbers for the record, stating "Okay, I've got one, four, sixteen, seventeen, twenty, twenty-one, twenty-two. Anybody else in my - twenty-three, fifteen. Do I have everybody here? Fourteen. Moving over here twenty-seven, twenty-nine, thirty-two, thirty-six, forty-one, fifty-nine, fifty and fifty-five. I can't see your numbers. I'm doing this from memory, and forty-nine." (Emphasis added.). Jurors 49 and 62 subsequently interrupted Mr. Braddy's counsel's questioning, unprompted, to make some statements to clarify their responses (or lack thereof) to the above question. The following are discussions between Mr. Braddy's counsel and Jurors 49 and 62:
[Juror 49] : Ma'am, I will promise to keep a clear head and hear everything before I tender my decision, but I will not sit here and lie to you either -
[Mr. Braddy's Counsel] : Excellent.
[Juror 49] : - because I've got to live with me.
[Mr. Braddy's Counsel] : Absolutely.
[Juror 49] : And it is what I'm sensing is what I'm going on.
[Mr. Braddy's Counsel] : What you're sensing?
[Juror 49] : (Nodded head.) It's all that makes sense. What I'm sensing is what I'm doing. It's all I have to go by. I can't judge like the rest of you. I have to go with what I'm feeling.
[Mr. Braddy's Counsel] : Can you follow the Court's guidance?
[Juror 49] : Yes, I can.
[Mr. Braddy's Counsel] : And would it be fair to say that what you're sensing, *916 how you feel, how you decide is maybe common sense for you?
[Juror 49] : What I am sensing is what I have to sense every day in order to exist, because I am no longer given benefits that you are giving, your senses, which makes other senses more keen.
[Mr. Braddy's Counsel] : Okay.
....
[Juror 62] : Your question is I don't know if I agree with what [Juror 19] said. I don't know if I agree or not.
[Mr. Braddy's Counsel] : Okay. Number 62, let me go back through it for you. I asked the question if [Juror 19] could consider releasing my client knowing that he has been convicted of victimizing children, and she said - I'm going to try to make sure I get this right - that he should be committed or in jail, one or the other, but not released. She couldn't consider that as an option in this case, even though the Judge would instruct her. Do you agree with that?
[Juror 62] : No.
[Mr. Braddy's Counsel] : No?
[Juror 62] : I can listen to the case and then make my decision. Right now I don't have a decision on what should happen.
[Mr. Braddy's Counsel] : That's exactly what I asked. Does everybody understand that, everybody agree with that, that at this point there are no decisions that can be made? Even though we have some feelings, some of you are there, and that's okay. But under the law, the Judge will tell you to reserve your judgment, and I know you're getting tired of hearing me say that. I've said it like eight hundred times. Okay?
Counsel did not otherwise follow up as to what Juror 4 or other venirepersons meant by raising their hands. Nonetheless, at the close of voir dire, Mr. Braddy's counsel moved to strike Juror 4 for cause on the ground he was one of those who raised a hand when counsel asked the venire, "who here agrees with Number 19?" The State opposed the strike, stating "if that's going to be the only reason for these strikes going on here on out, I'm not willing to consent to anything that's based just on a hand raise. If there's something else, they verbalized or articulated some other reason in addition to that, I'm open to discussing it, but just a hand raise is not a commitment." The circuit court overruled Mr. Braddy's counsel's motion to strike Juror 4.[10]
Mr. Braddy now claims the circuit court erred in failing to strike Juror 4 for cause because his hand raise meant he also was not qualified to serve as a juror. Because Mr. Braddy failed to timely file a motion for new trial, this issue is reviewed only for plain error causing manifest injustice. Rule 30.20; Rule 78.07(a). This Court concludes the circuit court's decision to seat Juror 4 did not result in a manifest injustice as he was not shown to be unqualified under either section 494.470.1 or section 494.470.2.
The State argues a hand raise by a venireperson in response to a question from counsel should be given no meaning as it is just as likely to mean the person has a question or wants a break as it is to be a response to the question asked. This Court rejects that argument. It is common practice to ask venirepersons to raise their hands if they agree or disagree with a particular statement. Such practices would have little purpose if the jurors' responses *917 had no meaning. Indeed, the record shows the State repeatedly asked questions to the venire panel indicating a hand raise would be an appropriate response, such as, "So if you recognize one of these names, can I get you to raise your hands?" and, "Does anybody feel that is something they need to raise their hand on?"
This Court also rejects Mr. Braddy's counsel's argument that a mere hand raise in response to the question asking whether other venirepersons agreed with Juror 19 was sufficient, in itself, to require the court to disqualify Juror 4 for cause unless the court itself established through additional questioning that Juror 4 had been rehabilitated. Counsel cites no authority a judge is obligated to ask follow-up questions for every venireperson who raises a hand, when counsel has chosen not to do so, and this Court declines to so hold.[11]
This case provides a good example of why counsel's proposal that a hand raise requires disqualification would be unworkable. Counsel had just asked Juror 19 a series of complex questions and received a variety of answers, some of which were disqualifying, and others of which merely discussed Juror 19's views but were not in themselves disqualifying. Because there is no basis to determine which of Juror 19's statements Juror 4 was indicating agreement with, the hand raise by itself does not show Juror 4 had "formed or expressed an opinion concerning the matter or any material fact in controversy" or could not "follow the court's instructions." § 494.470 . Indeed, when Mr. Braddy's counsel did later follow up with one of the other venirepersons, that venireperson was able to explain, while he had some of Juror 19's concerns, he could follow the court's instructions. Counsel simply chose not to similarly follow up with Juror 4 as to what he meant by raising his hand.
Moreover, a "venireperson's qualifications as a prospective juror are not determined by an answer to a single question, but by the entire examination." Joy, 254 S.W.3d at 890 . In Joy , a prospective juror made statements during voir dire that expressed a " 'strong bias' against 'lawsuits in general.' " Id. But when subsequently asked if he could be "fair and unbiased" the juror responded that he could. Id.
Of particular relevance here, Joy noted "there were numerous questions posed to the entire venire to which [the venireperson] did not feel compelled to respond" concerning whether they could each follow the court's instructions and keep an open mind until they had heard the evidence at trial. Id. From considering these facts, this Court held, "although [the juror] gave some answers during voir dire that raised the possibility that he was prejudiced, the trial court did not abuse its discretion in finding that the tenor of his testimony overall was that he would be fair and impartial." Id. at 891 .
As in Joy , counsel for both parties asked numerous questions of the entire venire panel aimed at determining whether the potential jurors would have trouble keeping an open mind, hearing all the evidence before coming to any conclusions concerning Mr. Braddy, and following the court's instructions. As in Joy, Juror 4 did not raise a hand or otherwise respond affirmatively to any of those questions, which included:
*918 [State]: Does anybody think that sounds unfair, that if you're going to serve on a case, you've got to keep an open mind until everybody has had a chance to get their case out in front of you?
....
[State]: [W]ould anybody have a problem following this directive that you're not to make up your mind about the case until all the evidence and the closing arguments have come before you? Would anybody have a problem waiting until all the evidence came in, everybody had a chance to argue to you, and then you make up your mind?
....
[State]: Even if the subject material is distasteful and you're not going to like it, would everybody agree that they could follow the Court's instruction and wait until all the evidence is in and wait until everybody has had a chance to make their case?
....
[State]: Does anybody feel who hasn't already said so they could not give the Respondent, Mr. Braddy, a fair shake and a chance to be heard?
....
[State]: [H]as anybody else kind of taken the position that they already kind of decided how the case should turn out even though they haven't heard anything, and it happens?
....
[State]: And can anybody think of any reason they haven't already stated that they could not give everybody a chance to be heard, that they could not wait until all the evidence comes in and all the closing arguments are made before they make up their mind how the case should end?
....
[Mr. Braddy's Counsel]: Is there anybody who thinks, you know what, once I hear the word pedophilia, I cannot consider committing him or letting him go? I can't follow the Judge's instructions.
....
[Mr. Braddy's Counsel]: Is there anybody who agrees ... [that] leopards don't change their spots? ... Is there anybody who can't consider the notion that people change? In a case like this, is there anybody who says, you know what, especially in a case like this, people don't change?
As in Joy , the fact Juror 4 did not feel compelled to respond affirmatively to any of these questions is appropriate for the court to consider in determining whether Juror 4 is qualified under section 494.470.2. Jurors will be disqualified under section 494.470.2, however, only if their beliefs "preclude them from following the law as declared by the court in its instructions." § 494.470.2. When looking at the totality of Juror 4's voir dire examination, it is reasonable to find "the tenor of his testimony overall was that he would be fair and impartial." Joy, 254 S.W.3d at 891 . The circuit court did not commit a manifest injustice by overruling Mr. Braddy's counsel's motion to disqualify Juror 4.
VI. CONCLUSION
For these reasons, the judgment committing Mr. Braddy to the custody of the department of mental health is affirmed.
Fischer, C.J., Wilson, Russell and Powell, JJ., concur; Draper, J., concurs in separate opinion filed; Breckenridge, J., concurs in opinion of Draper, J.
CONCURRING OPINION
George W. Draper III, Judge
I concur with the principal opinion's holding James Braddy (hereinafter, "Braddy")
*919 has a constitutional right to effective assistance of counsel in proceedings to commit him pursuant to the Sexually Violent Predator Act (hereinafter, "the Act"). I further concur with the principal opinion's holding Braddy did not receive ineffective assistance of counsel. However, the principal opinion did not reach or resolve the issue concerning which standard should apply when a civilly committed sexually violent predator (hereinafter, "SVP") raises ineffective assistance of counsel claims. Hence, I write separately because I believe this case of first impression, along with its companion case, In re the Matter of the Care and Treatment of Nicholas Grado , No. SC96830, 559 S.W.3d 888, 2018 WL 4572722 (Mo. banc 2018), present this Court with the opportunity to declare the appropriate standard. After reviewing a wealth of persuasive legal authority from other jurisdictions implementing the same standard under the same circumstances, had the principal opinion addressed the matter, I believe it would be clear these claims should be reviewed under the standard set forth in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
In this case, the state argued, if this Court determined an ineffective assistance of counsel claim raised by an SVP was cognizable, the appropriate standard should be whether the attorney was effective in providing the client with a meaningful hearing based on the record. This is the same standard of review that applies in termination of parental rights cases. In Interest of J.P.B. , 509 S.W.3d 84, 97 (Mo. banc 2017). However, the state cannot cite any legal authority-from Missouri or other jurisdictions-applying such a minimal standard to SVP proceedings. In contrast, Braddy cites widespread support in other jurisdictions to apply Strickland to involuntary commitments generally and specifically to SVP proceedings, which result in a form of involuntary commitment. I believe these cases constitute persuasive authority for this Court to adopt the Strickland standard.
When examining involuntary commitment proceedings generally, courts apply the Strickland standard. The Wisconsin Supreme Court noted in Matter of Commitment of J.M. , 381 Wis.2d 28, 911 N.W.2d 41, 50 (2018), "neither the parties nor our research has revealed any jurisdiction that currently applies a standard different than Strickland to claims of ineffective assistance of counsel in commitment proceedings." J.M. noted Strickland should govern because "the liberty interests of a movant at stake in the involuntary commitment proceeding are similar to the liberty interests of a movant in criminal proceedings," and the "similarity of liberty interests involved in these proceedings, namely that an institutionalized person is subject to state control and direction (here medical treatment) that the institutionalized person claims is not warranted under the law, supports applying the same standard for evaluating ineffective assistance of counsel claims in criminal proceedings and in involuntary commitment proceedings." Id. , at 49. Moreover, "the Strickland standard would be easier for the bench and bar to apply in a variety of cases than a new standard" because it "has been known to and applied by both the bench and the bar for more than 30 years" and "carries with it a developed body of case law that will aid courts in the efficient and timely resolution of claims of ineffective assistance of counsel." Id. , at 50.
In In re Henry B. , 159 A.3d 824, 827 (Me. 2017), the Maine Supreme Court adopted the Strickland standard for involuntary civil commitments because "the liberty interests at stake are on par with those at stake in criminal cases, Strickland is a well-known and developing standard, *920 and a 'more intrusive post-trial inquiry could encourage the proliferation of ineffectiveness challenges, and possibly delay the permanency necessary to stabilize' a mentally ill individual's treatment in a safe environment." Further, in Matter of J.S. , 388 Mont. 397, 401 P.3d 197, 204 (2017), the Montana Supreme Court noted, because involuntary civil commitment of any type involves the potential deprivation of liberty, albeit under the Fourteenth Amendment rather than the Sixth Amendment, "[a]ll courts recognizing a right to counsel in civil commitment proceedings have drawn on Sixth Amendment precedent established by Strickland ." Other cases adopting this standard in civil commitment proceedings apply similar reasoning.[1]
When determining what standard to apply to SVP proceedings, every jurisdiction to address the issue has universally adopted the Strickland standard. In Matter of Chapman , 419 S.C. 172, 796 S.E.2d 843, 849 (2017), the South Carolina Supreme Court held the "appropriate standard in these instances is the two-prong Strickland standard used to vindicate a criminal defendant's Sixth Amendment right to counsel" for an "SVP's right to counsel arises from a constitutional right to due process similar to the rights attendant to a criminal trial." Matter of Chapman held application of Strickland simplifies and makes the effectiveness determination more accurate and consistent because "a majority of jurisdictions use the Strickland standard in evaluating ineffective assistance claims in a civil commitment context" and because " Strickland is a well-known standard applied in an extensive body of case law in the criminal and civil contexts." Id.
Similarly, in In re Ontiberos , 295 Kan. 10, 287 P.3d 855, 868 (2010), the Kansas Supreme Court declined to adopt its "right-to-fair-trial framework" used in cases when a civil litigant alleged opposing counsel committed misconduct and rather held "the well-known Strickland test better addresses the concerns embodied in ineffective assistance of counsel claims in KSVPA proceedings." It noted, although the "United States Supreme Court crafted Strickland to determine when counsel's performance violates a criminal defendant's Sixth Amendment right to counsel," "it makes sense to apply the same standard based on a Fourteenth Amendment right to counsel." Id. Further, the court found because Strickland has been uniformly adopted, it is "likely to invite a more consistent application." Id. Accordingly, "the two-prong Strickland test applies because [the] right to counsel arises from a constitutional right similar to the rights attendant to a criminal trial." Id. ; accord Jenkins v. Dir. of Va. Ctr. for Behavioral Rehab. , 271 Va. 4, 624 S.E.2d 453, 460 (2006) ; In re Detention of Crane , 704 N.W.2d 437, 439 (Iowa 2005) ; In re Detention of Moore , 167 Wash.2d 113, 216 P.3d 1015, 1020 (2009) ; People v. Rainey , 325 Ill.App.3d 573, 259 Ill.Dec. 369, 758 N.E.2d 492, 503 (2001).
After examining the reasoning of the cases from other jurisdictions applying Strickland in general involuntary civil commitment proceedings and in SVP proceedings, I believe Strickland articulates the appropriate standard for SVP proceedings and should be adopted in Missouri. An SVP's right to counsel arises from a constitutional right to due process, similar to-albeit *921 distinct from-the Sixth Amendment right to counsel, and the right exists because it is the SVP's liberty that is affected, similar to a criminal commitment. The right to counsel arises from the Fourteenth Amendment and protects the individual from an unlawful infringement on liberty, similar to a criminal commitment. Given the similarities between SVP proceedings and criminal commitment, it is not only reasonable, but also prudent, to look to criminal standards for guidance.
Hence, I would find the Strickland standard should be applied when civilly committed SVPs raise ineffective assistance of counsel claims. I concur in all other respects.

All references will be to RSMo 2016, unless otherwise noted.

The amended information leading to his most recent conviction shows Mr. Braddy had previously been found guilty of endangering the welfare of a child, abuse of a child, and second-degree rape.

Section 589.040 provides, "All persons imprisoned by the department of corrections for sexual assault offenses shall be required to successfully complete the program[ ] ... prior to being eligible for parole or conditional release."

Section 632.480 defines an SVP as "any person who suffers from a mental abnormality which makes the person more likely than not to engage in predatory acts of sexual violence if not confined in a secure facility" and who "has pled guilty or been found guilty ... of a sexually violent offense."

[Mr. Braddy's counsel]: You testified yesterday that you've done five - somewhere around five thousand [end-of-confinement] evaluations during your time at the Department of Corrections in Missouri?
[Dr. Weitl]: Yes.
....
[Mr. Braddy's counsel]: Those are limited evaluations by definition, correct?
[Dr. Weitl]: It's a screening process; yes.
[Mr. Braddy's counsel:] Not intended to testify in court, correct?
[Dr. Weitl]: I testified in probable cause hearings, so....
....
[Mr. Braddy's counsel] : The point is, you're - in fact, for years you would testify at the end of confinement report at the probable cause hearing and not be called during a trial, correct?
[Dr. Weitl] : It was not the habit for them to use us in the trial; correct.
[Mr. Braddy's counsel] : And the point of your screening evaluation is to determine whether or not a respondent should be screened, only screened, correct?
[Dr. Weitl] : No. I was the screener to see whether or not he met the criteria.
[Mr. Braddy's counsel] : And your report was passed along to the Multidisciplinary Team?
[Dr. Weitl] : Correct.
[Mr. Braddy's counsel] : Who would make a determination?
[Dr. Weitl] : They voted on their opinion.
[Mr. Braddy's counsel] : And there were times that team voted no in direct contravention of your recommendations?
[Dr. Weitl] : Right, but the case went forward anyway.

[Mr. Braddy's Counsel] : So this [report] is [your] screening evaluation?
[Dr. Kircher] : Yes.
[Mr. Braddy's Counsel] : This is not an evaluation that is intended to be presented in a trial about whether or not a respondent is a sexually violent predator?
....
[Dr. Kircher] : The purpose of the report is to inform the Multidisciplinary Team. That is correct as it states.
[Mr. Braddy's Counsel] : It's not a full forensic evaluation, is it? Are you appointed by the court to create an evaluation?
[Dr. Kircher]: I've never been appointed by a court to create any evaluation.
....
[Mr. Braddy's Counsel] : You don't have Iron County's prosecutor reports?
[Dr. Kircher] : No.
[Mr. Braddy's Counsel] : You don't have Reynolds County's prosecutor reports?
[Dr. Kircher] : That's correct.
[Mr. Braddy's Counsel] : Court reports from either of those counties?
[Dr. Kircher] : That's correct.
[Mr. Braddy's Counsel] : Any of the letters Mr. Braddy has written since his internment at the last year?
[Dr. Kircher] : My report was conducted more than a year ago. So, no, I wouldn't have things that happened after it.
[Mr. Braddy's Counsel] : So you have no information as to his thought patterns now?
[Dr. Kircher] : My report was conducted in August of 2015.
[Mr. Braddy's Counsel] : You have no information as to his thought patterns now?
[Dr. Kircher] : That's correct.

[Mr. Braddy's Counsel] : You testified just a minute ago that you do screening reports. Are you familiar with the End of Confinement process?
[Dr. Scott] : I am.
....
[Mr. Braddy's Counsel] : ... When you do an End of Confinement evaluation, what kind of records do you have available to you to review?
[Dr. Scott] : When I'm doing them, it's [usually] for the Department of Mental Health. ... But we have police reports of their sexually violent offense in their history, whatever sexually violent offenses they've been charged or convicted for. We have their records from the Department of Mental Health, which are extensive because they've been committed to us usually for many years. We attempt to obtain outside records from other hospitals, and we often have court records related to their commitment files.
[Mr. Braddy's Counsel] : And is that a different situation than the End of Confinement reports that are conducted by the Department of Corrections?
[Dr. Scott] : Yes. There's overlap, but we have different information available.
[Mr. Braddy's Counsel] : Do you generally have more information available?
[Dr. Scott] : We have more clinical information because they've been committed to us for a long time. And so we have every assessment that's ever been done, all the progress notes, all the ongoing evaluations of their functioning.
[Mr. Braddy's Counsel] : What is the - is the standard in testifying for an End of Confinement report different from the standard in which you're testifying today?
....
[Dr. Scott] : Yes. At the level of that screening evaluation, we call it an SVP screening within the Department of Mental Health, at that level when we testify it's - the standard of proof is a preponderance of the evidence, whereas in this case it's clear and convincing evidence. So today the standard is much higher than I would be testifying if this were a probable cause hearing.

Mr. Braddy further claims counsel was ineffective because Dr. Weitl testified "[n]inety-seven percent of the cases ... [she has] reviewed did not meet the [SVP] criteria" and Dr. Kircher testified only "[r]oughly 3 to 5 percent" of the individuals she evaluates meet the SVP criteria. But in both instances the testimony was elicited by the State on direct examination, and in the former instance, over Mr. Braddy's counsel's objections.

Rule 78.04 provides a motion for new trial "shall be filed not later than thirty days after the entry of judgment." Although the circuit court purported to grant Mr. Braddy a 10-day extension to file his motion for new trial, "it may not extend the time for taking any action under Rule[ ] ... 78.04." Rule 44.01. The circuit court, therefore, did not have the authority to grant the extension and Mr. Braddy's motion for new trial - filed 36 days after the judgment - was untimely. The SVP commitment proceeding was a civil, jury-tried case. As such, "allegations of error must be included in a motion for a new trial in order to be preserved for appellate review." Rule 78.07(a). Unpreserved issues "can only be reviewed for plain error." Letica, 356 S.W.3d at 167.

Juror 4 was the only venireperson who raised a hand in response to this question who ultimately sat on the jury.

As Mr. Braddy notes, "A failure by a trial judge to question independently a potential juror to explore possible prejudice may undercut any basis for a trial judge's exercise of discretion and constitute reversible error." Joy v. Morrison, 254 S.W.3d 885, 888 (Mo. banc 2008). But Joy involved far more than a single hand raise by the juror in question.

See, e.g., In re Detention T.A.H.-L , 123 Wash.App. 172, 97 P.3d 767, 771 (2004) ; State of Tex. for the Best Interest and Protection of H.W. , 85 S.W.3d 348, 356 (Tex. App. 2002) ; Pope v. Alston , 537 So.2d 953, 956-57 (Ala. Civ. App. 1988) ; In re Alleged Mental Illness of Cordie , 372 N.W.2d 24, 29 (Minn. Ct. App. 1985).