In the
 Missouri Court of Appeals
 Western District
 IN THE MATTER OF THE CARE )
 AND TREATMENT OF JERRY )
 DAVIS, A/K/A JERRY M. DAVIS, ) WD83673
 JR., A/K/A JERRY MILLER DAVIS, )
 JR., ) OPINION FILED:
 ) September 14, 2021
 Appellant, )
 )
 v. )
 )
 STATE OF MISSOURI, )
 )
 Respondent. )

 Appeal from the Circuit Court of Buchanan County, Missouri
 The Honorable David L. Bolander, Judge

 Before Division Four: Cynthia L. Martin, Chief Judge, Presiding, Gary D. Witt, Judge
 and Roy L. Richter, Special Judge

 Jerry Davis ("Davis") appeals from the judgment of the Circuit Court of Buchanan

County, Missouri ("trial court") finding Davis to be a sexually violent predator ("SVP")

under the Sexually Violent Predator Act, sections 632.480 through 632.525 1 ("the Act"),

and committing her to the Missouri Department of Mental Health. On appeal, Davis argues

 1
 All statutory references are to R.S.Mo. 2016, as updated by supplement, unless otherwise noted.
that: (1) trial counsel was ineffective for failing to investigate the fact that Davis is

transgender, because her2 status as a transgendered woman impacts her risk assessment for

future dangerousness; (2) trial counsel was ineffective for failing to litigate that Davis is

transgender, for the same reasons; and (3) the trial court erred and abused its discretion in

refusing Davis's proposed jury instruction informing the jury that, as a matter of law,

possession of child pornography is not a sexually violent offense as defined in the Act. We

affirm the judgment of the trial court.

 Factual and Procedural Background

 In 1994, Davis was convicted of attempted sexual battery in the state of Florida

involving sexual contact she had had with her eight- or nine-year-old step-daughter.3 This

was a sexually violent offense, and Davis completed a prison sentence in 2002 and was

then released on probation4 for that offense. During the period of probation, Davis received

six years of sex offender treatment. After Davis's treatment, she moved to Buchanan

County with her mother and her wife (not the child victim's mother). In 2014 in Buchanan

County, she approached a woman in a grocery store, began a sexual conversation in an

attempt to convince the woman to join her and her wife in a sexual encounter. During their

conversation, Davis told the woman that she had some niche sexual preferences and

showed the woman images on her phone of herself in a negligee and photos of underage

 2
 Davis identifies as a transgender woman, although she has male genitalia and has no current plans to
obtain gender reassignment surgery. We use feminine pronouns for Davis, which is her preference. Davis was
referred to as he and him at the trial.
 3
 Davis's account of this abuse was inconsistent with respect to the girl's age when the abuse began. Davis
was not sure whether the girl was eight or nine years old.
 4
 Her release from prison in Florida was referred to as "probation" throughout the trial, but appears to be
more consistent with "parole." We use the term probation as that is the term used below, and how it is defined is not
critical to the analysis of the issues presented.

 2
naked girls. The woman called the police, and Davis ultimately pleaded guilty in 2014 to

possession of child pornography and was sentenced to six years in prison. Before her

release from prison in 2018, the State filed a petition seeking to civilly commit Davis as an

SVP.

 At Davis's jury trial in 2020, Dr. Sarah Mielens ("Dr. Mielens"), who had reviewed

Davis's records and had interviewed her, testified as to her findings. Dr. Mielens testified

that Davis had been convicted of attempted sexual battery in Florida, which qualified as a

sexually violent offense, as it involved fondling and ultimately performing and receiving

oral sex with her underage step-daughter over the course of at least six months. Dr. Mielens

also testified that Davis had been convicted of possessing child pornography, which was

not a sexually violent offense as defined by the Act. Dr. Mielens testified about Davis's

other, non-charged past behavior, which included the following:

 • At the age of ten, Davis fondled the vagina of a two-year-old neighbor
 under her clothes;

 • At the age of thirteen, Davis fondled the vagina of a five-year-old;

 • At the age of fourteen, Davis fondled a thirty-year-old's breasts and vagina
 while the woman was sleeping;

 • At the age of fifteen, Davis and an eight-year-old showed each other their
 genitals;

 • At the age of fifteen, Davis fondled the chest and buttocks of a four-year-
 old in her Sunday School class;

 • Also at the age of fifteen, Davis attempted to have intercourse with a five-
 year-old, but the girl told Davis that it hurt, so she stopped;

 3
 • At the age of seventeen, Davis attempted to have sex with a twelve- or
 thirteen-year-old cousin, who was curious about sex, but Davis stopped
 because the cousin told her it hurt;

 • At age twenty-four, Davis picked up a fifteen-year-old hitchhiker and they
 engaged in oral sex;

 • Also at age twenty-four, Davis had a sexual relationship with a sixteen-
 year-old girl that lasted approximately six months;

 • At around age twenty-six to twenty-eight, Davis had intercourse with an
 adult woman she was dating while the woman was unconscious;

 • At age thirty-seven, Davis fondled the penis of a three- or four-year old boy
 while bathing him;

 • That same year, Davis fondled the vagina of a six-year-old girl who lived
 in her neighborhood and fondled the breasts of a twelve-year-old girl while
 wrestling with her, as well as the six-month sexually abusive contact with
 her step-daughter;

 At the time of Davis's arrest for possession of child pornography in 2014, she had

access to several children who also lived with her in Davis's mother's home. These children

denied that Davis ever touched them inappropriately. Davis admitted to being attracted to

two of them, however, and one of them had used Davis's camera to take pictures of her

genitalia, although she denied that Davis persuaded her to do this.

 Dr. Mielens testified that she determined Davis had a mental abnormality in that she

had pedophilia disorder, which rendered her attracted to pre-pubescent children, and

voyeuristic disorder, which Dr. Mielens described as watching people who are naked,

disrobing, or engaging in sexual activity, without their knowledge. Davis told Dr. Mielens

that she had watched men shower while incarcerated. Dr. Mielens described Davis's sexual

 4
interests as "varied." She is attracted to men, women, children, and adults; she likes

viewing lesbian sexual activity, group sexual activities, and she is interested in incest.

 Dr. Mielens also testified how she calculated Davis's risk of committing future

predatory acts of sexual violence due to this mental abnormality. She used the Static-99R

test, the Static-2002R test, and the Stable-2007 test. These actuarial instruments were

created over a course of years by examining a pool of offenders whose rates of recidivism

were measured at five or ten years following release. Davis's Static-99R score put her in

the "average risk" category, which means that she had a nine percent chance of reoffending

within five years and a roughly sixteen percent chance of reoffending within ten years. Dr.

Mielens testified that the Static-99R score was lower due mostly to Davis's age because

sexual behavior generally declines in older populations. However, Davis, who was sixty-

three at the time of trial, described her sexual interest as "active and high," and she had

engaged in recent sexual behavior, including masturbation, mental fantasies, and sex with

another inmate while incarcerated.

 Dr. Mielens testified that Davis's score on the Static-2002R placed her in the

"moderate to high" risk category because she had: a prior sexual offense, a prior non-

contact sexual offense, a male victim, a young unrelated victim, prior involvement with the

criminal justice system, and a community supervision violation.

 Dr. Mielens testified that the Stable-2007 measures "dynamic factors," and it placed

Davis in the high-risk category. Some of the factors responsible for Davis's score were

lack of significant social influences, impulsivity, sex drive, sex preoccupation, and deviant

 5
sexual preference. Finally, Dr. Mielens considered an article by Mann, et al., from 2010,5

that looks at risk factors identified as consistently shown to predict future risk of offending

but that are not directly addressed in the Static and Stable assessments. Dr. Mielens found

that Davis had several of these risk factors including multiple paraphilias (her pedophilic

disorder and her voyeuristic disorder) and also "offense-supporting attitudes," including

her belief that children "were capable of desiring and engaging in sexual behaviors." Dr.

Mielens concluded that it was her opinion to a reasonable degree of psychological certainty

that Davis suffered from a mental abnormality that makes her more likely than not to

commit predatory acts of sexual violence if not confined to a secure facility and that Davis

was a violent sexual predator.

 Dr. Nena Kircher ("Dr. Kircher") also testified at Davis's trial. Dr. Kircher is a

licensed psychologist, who has performed 2,500 to 3,000 sexually violent predator

evaluations, including one for Davis. Her evaluation of Davis was based upon reviewing

her records and conducting an interview with her. Dr. Kircher testified that Davis had a

mental abnormality based upon her diagnosis of pedophilic disorder. Davis is attracted to

both children and adults and both males and females. Davis described being attracted to

female children who are flat-chested and do not yet have pubic hair. Davis reported having

sexual fantasies of such children at least once per week and of masturbating to those

fantasies at least twice per month. Davis also told Dr. Kircher that she dreamed about the

underage step-daughter she molested every three months or so.

 5
 The name of the article does not appear in the record, but the article was referenced in the experts'
testimony and in the written Sexually Violent Predator Evaluation signed by Dr. Mielens and Dr. Heather
McMahon.

 6
 While Dr. Kircher acknowledged that Davis had not had any contact offenses since

she completed the treatment program in Florida, Davis's conduct of approaching a stranger

who was in line with her at a store and showing her sexual images on her phone, including

those of child pornography, was "very impulsive" and showed a lack of control over her

own behavior. Dr. Kircher also testified that Davis's act of masturbating to fantasies of

children reinforces those fantasies rather than using the tools Davis had learned in treatment

to avoid the fantasies, which also shows Davis's lack of ability to control her behavior.

 Dr. Kircher concluded that it was her opinion, to a reasonable degree of

psychological certainty, that Davis suffers from a mental abnormality that makes her more

likely than not to engage in future acts of predatory sexual violence if she is not confined

to a secure facility. She testified that Davis fell into the "average risk" of reoffending using

the Static-99R, but that Davis was "struggling much more than what we would expect [her]

to be" based on Davis's self-report of inappropriate sexual interests, thought patterns, and

behavior. Dr. Kircher testified that Davis's score on the Stable-2007 placed her in the

category of high need for treatment. Davis's particular risk factors included emotional

identification with children, lack of concern for others, impulsive acts, poor problem-

solving, sexual preoccupation, sex as coping, and deviant sexual preference. Finally, Dr.

Kircher also considered the Mann article, and noted that Davis had a sexual preference for

children, that Davis had multiple deviant interests with no aversion to incest, that Davis

had had sex with an unconscious woman, and that she had expressed an interest in bestiality

pornography. Dr. Kircher testified that, although Davis had received sex-offender

 7
treatment in both Florida and Missouri, she did not appear to have successfully applied the

treatment to manage her sexual fantasies regarding children.

 Davis also testified at her trial. She testified that many of her sexual encounters

with minors seemed very normal to her but that she did realize her molestation of her step-

daughter was wrong. She testified,

 During the time when I was actually molesting her, there were a couple of
 occasions where I said that, you know, "This is wrong," you know, "You've
 got to quit doing this." And for whatever reason or other, I turned right
 around and started doing it again. I mean, it wasn't like three or four days
 before I decided to start doing it again.

Davis testified that she vowed she would not molest her step-daughter again but that she

had thought about it more than once.

 Davis testified that she still has sexual thoughts of children because they do not

judge her and because she likes the smooth, clean lines of their bodies due to the lack of

pubic hair. Davis testified that she had thought about having a sexual relationship with two

of the children who had lived with Davis at her mother's home, one of whom was her niece.

Davis testified that she was "reviewing the possibility of having a sexual relationship" with

one of those children (who was no longer underage) upon her release from prison.

 Davis called an expert, Dr. Jarrod Steffan, who testified that Davis did not still have

a serious difficulty controlling her behavior, even though she still had sexual attraction to

children, primarily because she had not had a contact sex offense in the twenty-five years

since she completed the treatment in Florida.

 The jury unanimously found Davis to be a sexually violent predator. The trial court

concluded that there was no probable cause to believe that Davis had ineffective assistance

 8
of counsel, and the trial court committed Davis to the custody of the Department of Mental

Health for her control, care, and treatment. Davis appeals.

 Ineffective Assistance of Counsel

 Standard of Review and Analysis

 Davis's first two claims of error involve allegations of ineffective assistance of trial

counsel, and we will analyze these two claims together. Individuals do have the right to

effective assistance of counsel in SVP proceedings. In re Care & Treatment of Grado, 559

S.W.3d 888, 895-96 (Mo. banc 2018). The Missouri Supreme Court has not, however,

determined whether these issues are reviewed through the "meaningful hearing standard"

utilized in parental termination proceedings or the more exacting Strickland standard

utilized in criminal postconviction proceedings. See In the Matter of the Care & Treatment

of D.N., 598 S.W.3d 108, 121 (Mo. banc 2020) (citing Grado, 559 S.W.3d at 898-99; and

Strickland v. Washington, 467 U.S. 1267, 104 S. Ct. 3562, 82 L.Ed.2d 864 (1984)).

 "Under the 'meaningful hearing' standard, this Court would determine--based
 on the record on appeal--whether counsel provided [the offender] with a
 meaningful SVP hearing." Id. at 898. "Strickland would require [the
 offender] to show by a preponderance of the evidence: (1) his or her counsel
 failed to exercise the level of skill and diligence that a reasonably competent
 counsel would in a similar situation, and (2) he or she was prejudiced by that
 failure." Id. (quoting Mallow v. State, 439 S.W.3d 764, 768-69 (Mo. banc
 2014)). "In order to prove the prejudice prong of Strickland, the question is
 whether 'there is a reasonable probability that, but for counsel's
 unprofessional errors, the result of the proceeding would have been
 different.'" Id. (quoting Strickland, 466 U.S. at 694, 104 S. Ct. 2052).

Id.

 Because the Missouri Supreme Court has not yet provided guidance to the trial

courts and intermediate appellate courts as to which of the two standards should be applied

 9
in ineffective assistance claims for SVP cases, courts typically analyze them under both

standards to determine if the outcome would be the same regardless of the standard utilized.

See, e.g., Matter of Care & Treatment of Braddy, 559 S.W.3d 905, 910 (Mo. banc 2018);

Matter of Bohannon, 583 S.W.3d 490, 493-94 (Mo. App. S.D. 2019). Here, as in In the

Matter of D.N., Davis fails to show counsel was ineffective under either standard. Davis's

claims were:

 Trial counsel was ineffective for failing to [Point I] investigate [and (Point
 II) litigate] the fact that Ms. Davis is transgender, because Ms. Davis's status
 as a transgender woman impacts her risk assessment for future
 dangerousness. This was error in that but for this omission by counsel there
 was a reasonable chance of a different outcome at trial as many of the
 instruments used in this case were only validated for cisgender males.

Because Davis does not set forth the method or scope of investigation she believes

reasonable counsel should have undertaken under the meaningful-hearing standard, nor

does Davis show prejudice for her trial counsel's failure to investigate and litigate whether

Davis's self-identification as a transgender woman impacts her risk for future

dangerousness, we deny both of these points on appeal.

 Davis makes much of the fact that her trial counsel did not appear to have expressly

considered arguing that Davis's identification as a transgender woman might affect her risk

for future dangerousness, stating to appellate counsel, "I just missed it." But while Davis's

preference for female clothing outside of incarceration and her self-identification as a

transgender woman were discussed and presented to the jury, Davis presents no evidence

that her identification as a transgender woman would in fact make her less dangerous to

reoffend or if her identification as a transgender woman would potentially positively or

 10
negatively impact the results of the Static-99R test, the Static-2002R test, or the Stable-

2007 test. In addition, Davis fails to establish at what point during her life she began to

identify as a woman. Many of the offenses Davis committed appear to have been

committed during a time period when she identified as a man.6 Also, a reading of the trial

transcript reveals that everyone involved with the trial, including Davis's own expert and

her mother, referred to Davis as "he" or "him," even at the time of her trial. Davis clearly

identified as a man at various points in her life and expressed no plans to seek gender

reassignment surgery at the time of trial, citing her age as well as the financial cost, and

stating to Dr. Mielens that "he was happy with how he was, and that at his age there 'isn't

a point' to gender reassignment surgery or hormone treatments since he has lived his entire

life the way he is now."

 Davis now argues that the Static and Stable actuarial instruments, which were used

by all of the evaluating doctors to determine her risk of future offending, were developed

for use on male offenders who identified with their birth sex. However, Davis cites no

evidence, study, or similar assessment tool that would indicate that she is less likely to

offend or even that her scores on the testing instruments would have been affected either

positively or negatively simply because she now identifies as a woman. She does not cite

to anything her counsel could possibly have produced or argued at trial that he failed to do

that would have deprived her of a meaningful hearing. Davis also does not show any

evidence of what steps a reasonable attorney would have taken to show that her

 6
 The record before us fails to establish which of her sexual offenses occurred while she identified as a man
and which occurred after she began to identify as a woman.

 11
identification as transgender would have rendered her any less dangerous to reoffend or

would have reasonably affected the outcome of her trial. The jury had ample opportunity

to consider all of the facts specifically applicable to Davis, including her gender identity.

 Davis's testimony and the other evidence produced at trial, which the jury found

credible, established that she still had strong improper sexual urges, still identified with

children, still was sexually attracted to children, still had multiple paraphilia, still

entertained the idea of pursuing a sexual relationship with a relative she had met as a child

and had recently reached the age of majority, still enjoyed child pornography, and still

masturbated to her sexual fantasies regarding children with her male genitalia. These

factors were the factors cited by the experts in concluding that Davis was a danger to

commit future predatory sexually violent acts if not committed to a secure facility. It is

Davis's burden to establish that counsel's failure to investigate and litigate an issue fell

below the standards of a reasonable attorney to establish that counsel was ineffective.

Davis also bore the burden of establishing that any such investigation or litigation of the

issue would have successfully revealed evidence which would have materially affected the

outcome of the trial. See Braddy, 559 S.W.3d at 910. Because, on appeal, Davis cannot

cite to any evidence or study that could possibly support her position even were we to

remand her case for a new trial, she was not denied effective assistance of trial counsel for

counsel's failure to investigate or litigate the issue of her gender identity, and thus Davis's

first two points on appeal are denied.

 12
 Jury Instructions

 Davis's third point on appeal is that the trial court erred in refusing her proposed

jury instruction, which would have expressly instructed the jury that possession of child

pornography is not a sexually violent offense under the Act. We find no error.

 Standard of Review

 Whether a jury was properly instructed is a question of law, which this court reviews

de novo. Morgan v. State, 272 S.W.3d 909, 911 (Mo. App. W.D. 2009). "Ordinarily,

courts look to the Missouri Approved Instructions (MAI) for guidance in resolving

questions of instructional error." Id. There are no MAIs for sexually violent predator cases.

Kirk v. State, 520 S.W.3d 443, 456 (Mo. banc 2017). "When there is no applicable MAI

instruction, the instruction given must be 'simple, brief, impartial, free from argument, and

shall not submit to the jury or require findings of detailed evidentiary facts.'" Morgan, 272

S.W.3d at 911 (quoting Rule 70.02(b)).

 Analysis

 Under section 632.480(5), for a court to commit a person to the custody of the

Department of Mental Health as an SVP, the State must prove, by clear and convincing

evidence, that: (1) the person has committed a sexually violent offense; (2) the person

suffers from a mental abnormality; and (3) the mental abnormality makes that person more

likely than not to engage in predatory acts of violence if not confined to a secure facility.

See Kirk, 520 S.W.3d at 448-49. The verdict directing instruction given to the jury by the

trial court (Instruction no. 7) read as follows:

 13
 If you believe the evidence clearly and convincingly establishes:

 First, that the respondent was found guilty of the felony of attempted sexual
 battery in the Circuit Court of Duval County, State of Florida, and

 Second, that the offense for which the respondent was convicted was a
 sexually violent offense, and

 Third, that the respondent suffers from a mental abnormality, and

 Fourth, that this mental abnormality makes the respondent more likely than
 not to engage in predatory acts of sexual violence if he is not confined to a
 secure facility,

 then you will find that the respondent is a sexually violent predator.

 However, unless you find and believe the evidence has clearly and
 convincingly established each and all of these propositions, you must find
 the respondent is not a sexually violent predator.

 As used in this instruction, "sexually violent offense" includes the Florida
 felony of attempted sexual battery.

 As used in this instruction, "mental abnormality" means a congenital or
 acquired condition affecting the emotional or volitional capacity that
 predisposes the person to commit sexually violent offenses in a degree that
 causes the individual serious difficulty in controlling his behavior.

 As used in this instruction, "predatory" means acts directed towards
 individuals, including family members, for the primary purpose of
 victimization.

 Davis's trial counsel argued to the trial court that this instruction might keep the jury

from unanimously determining that Davis was a sexually violent predator because some of

them might find that the "sexually violent offense" that Davis committed was not the

Florida felony of attempted sexual battery, as set forth in the instruction, but instead was

Davis's Missouri conviction for possession of child pornography. Therefore, counsel

proposed adding a provision to the instruction which expressly stated that the "sexually

 14
violent offense" does not include the Missouri felony of possession of child pornography.

The State argued, and the trial court concluded, that Davis's proposed instruction would be

confusing to the jury and did not accurately reflect the State's burden. We agree.

 The verdict director submitted by the State and given by the trial court accurately

reflected the law and the elements that the State was required to prove for Davis to be found

to have committed a sexually violent offense and to be determined a sexually violent

predator. See Kirk, 520 S.W.3d at 457. In fact, the verdict director given to the jury

expressly stated that the jury could find Davis to be an SVP only if it found that Davis had

been found guilty of the Florida attempted sexual battery felony and that this was a sexually

violent offense under the Act. The Florida offense was the only conviction mentioned in

the instruction, and thus we cannot conclude that the instruction was confusing for the jury.

There was evidence, including testimony, that Davis also committed the offense of

possession of child pornography in Missouri, but all of the evidence supported and all of

the experts testified that, in their opinions, possession of child pornography was not a

sexually violent offense. It would have been more confusing had the non-sexually-violent

offense been mentioned specifically in the instruction, particularly because there was also

evidence and testimony regarding other unlawful sexual acts that Davis had committed

over the course of her life, many of which would have been classified as sexually violent

offenses had the acts been discovered or reported and prosecuted, but these acts were absent

from the verdict director submitted by Davis, presumably so as not to unnecessarily

confuse the jury. The instruction given to the jury was proper, and Davis's third point on

appeal is denied.

 15
 Conclusion

 For all of the above-stated reasons, we affirm the judgment of the trial court.

 __________________________________
 Gary D. Witt, Judge

All concur

 16